UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HENRY A. JONES,<br><br>    Plaintiff,<br><br>    v.<br><br>P. KUPPINGER, et al.,<br><br>    Defendants. | No. 2:13-cv-0451 WBS AC P<br><br>FINDINGS AND RECOMMENDATIONS |

INTRODUCTION

Plaintiff Henry Jones is a state prisoner proceeding pro se with this civil rights action filed pursuant to 42 U.S.C. § 1983. Plaintiff paid the filing fee. This action proceeds on plaintiff's Second Amended Complaint (SAC), ECF No. 30, against defendant correctional officers Kuppinger and Moore, on the following claims:

> [P]laintiff's Second Amended Complaint states the following cognizable Eighth Amendment claims: (1) against defendant Kuppinger, deliberate indifference to plaintiff's serious medical needs, and excessive force; and (2) against defendant Moore, deliberate indifference to plaintiff's serious medical needs, and failure to protect plaintiff from excessive force.

See ECF No. 46 at 5 (court's screening of SAC pursuant to 28 U.S.C. § 1915A). Plaintiff seeks damages and declaratory relief. ECF No. 30 at 8-9. Although the parties participated in a settlement conference on May 4, 2016, the case did not settle. ECF No. 84.

1

Currently pending for decision is defendants' motion for partial summary judgment. See ECF No. 101. Defendants seek summary judgment on the merits of each of plaintiff's claims with the exception of his excessive force claim against defendant Kuppinger; alternatively, defendants assert they are entitled to qualified immunity. Plaintiff has filed an opposition, ECF No. 105; defendants have filed a reply, ECF No. 106. For the reasons set forth below, the undersigned recommends that defendants' motion for partial summary judgment be granted in part.

## LEGAL STANDARDS FOR MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Securities Litigation), 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B).

When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case." Oracle Corp., 627 F.3d at 387 (citing Celotex, 477 U.S. at 325); see also Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a

circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment ... is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11. Moreover, "[a] Plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence." Lopez v. Smith, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).[1]

The opposing party must demonstrate that the fact in contention is material, that is, a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc., 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, that is, the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

---

[1] In addition, in considering a dispositive motion or opposition thereto in the case of a pro se plaintiff, the court does not require formal authentication of the exhibits attached to plaintiff's verified complaint or opposition. See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (evidence which could be made admissible at trial may be considered on summary judgment); see also Aholelei v. Hawaii Dept. of Public Safety, 220 Fed. Appx. 670, 672 (9th Cir. 2007) (district court abused its discretion in not considering plaintiff's evidence at summary judgment, "which consisted primarily of litigation and administrative documents involving another prison and letters from other prisoners" which evidence could be made admissible at trial through the other inmates' testimony at trial); see Ninth Circuit Rule 36-3 (unpublished Ninth Circuit decisions may be cited not for precedent but to indicate how the Court of Appeals may apply existing precedent).

trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U .S. at 587 (citations omitted).

In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011) (per curiam). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. … Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

In applying these rules, district courts must "construe liberally motion papers and pleadings filed by pro se inmates and … avoid applying summary judgment rules strictly." Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010). However, "[if] a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion . . . ." Fed. R. Civ. P. 56(e)(2). In ruling on a motion for summary judgment, the question for the court is "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.

Moreover, "issues of fact created by [plaintiff] are not issues which this Court could reasonably characterize as genuine; rather, they are sham issues which should not subject the defendants to the burden of a trial." Radobenko v. Automated Equipment Corp., 520 F.2d 540, 544 (9th Cir. 1975). "'If a party who has been examined at length on deposition could raise an

issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.'" Id. (quoting Perma Research & Development Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969). "A party cannot create a genuine issue of material fact to survive summary judgment by contradicting his earlier version of the facts." Block v. City of Los Angeles, 253 F.3d 410, 419 n.2 (9th Cir. 2001) (citing Radobenko, 520 F. 2d at 544).

FACTS[2]

A. Undisputed Facts

- At all times relevant to his claims, plaintiff was a state prisoner incarcerated at California State Prison Sacramento (CSP-SAC) and defendants Kuppinger and Moore were correctional officers at CSP-SAC, employed by the California Department of Corrections and Rehabilitation (CDCR).

- CSP-SAC's Psychiatric Services Unit (PSU) provides mental health services to inmates with maximum security needs, including inmates with serious mental disorders who are designated for placement in the Security Housing Unit (SHU).[3] Kuppinger Decl. ¶ 5.

---

[2] These facts are based on the court's review of Defendants' Statement of Undisputed Facts (DUF), ECF No. 101-2, and Plaintiff's Statement of Undisputed Facts (PUF), ECF No. 105 at 10-4. The court has considered all exhibits and declarations submitted in support of each statement, including the transcript of plaintiff's July 15, 2015 deposition. Facts are also taken from plaintiff's verified SAC, ECF No. 30, verified opposition to the pending motion, ECF No. 105, and other pleadings. Plaintiff references an affidavit from another inmate ("Abby J."), see ECF No. 105 at 10, which does not appear to be included in plaintiff's exhibits.

[3] The PSU is designed to provide comprehensive mental health services to maximum security inmates. Upon an inmate's placement in the PSU, a senior psychologist assigns a Clinical Case Manager (CCM) to review the inmate's mental health history. Within five days, the CCM must complete an initial review of the inmate's mental health history and conduct an evaluation of the inmate. Within fourteen days of placement, an inmate is seen by an Interdisciplinary Treatment Team (IDTT), composed of a Senior Psychologist, Staff Psychiatrist, Facility Captain, Correctional Counselor II, Case Manager or designee, and other nursing staff. Other staff such as Recreation Therapists, Supervising Registered Nurses, Licensed Psychiatric Technicians, Sergeants, and Correctional Officers may also attend. The IDTT is responsible for developing and planning the mental health treatment for each inmate in the PSU. Kuppinger Decl. ¶ 8. Additionally, a Case Management Team (CMT), composed of the inmate's CCM, registered nurses or licensed psychiatric technicians, and designated custodial staff also assist with managing the day-to-day issues that arise with any given inmate in the PSU. Id. ¶¶ 7, 9.

- PSU inmates are classified as Maximum A custody. Anytime an inmate is removed from his assigned cell he is given an unclothed body search, secured in mechanical restraints (e.g., handcuffs, leg irons, and waist chains), and instructed to back out of the door. All escorts require at least two custody staff to assist. Additionally, all PSU inmates must have a predetermined destination before they are released from their cell. PSU inmates are not permitted to roam freely. Kuppinger Decl. ¶ 10.

- PSU inmates are restricted as to the items they are permitted to possess in their cell, including sharp objects, in order to ensure they are not a danger to themselves. Kuppinger Decl. ¶ 6.

- If a PSU inmate asserts he is suicidal, or information is received that an inmate is suicidal, PSU custody staff immediately notify their supervisors and mental health staff. Custody staff ensure the inmate is secured in a way that he cannot harm himself or others. A staff member is then assigned to monitor the inmate until he can be seen by mental health staff. Kuppinger Decl. ¶ 11.

- On the evening of May 12, 2011, at approximately 8:00 p.m., plaintiff was moved to CSP-SAC's PSU, in a single cell, pending an investigation for alleged overfamiliarity with a prison nurse.

- On the morning of May 13, 2011, approximately between 7:00 and 7:30 a.m., CDCR staff members passed by plaintiff's door distributing medication. Plaintiff told them that he could not breathe due to feces in his cell and that he needed to be moved.[4] Asked by staff if he was going to take his medication, plaintiff "said, 'I can't breathe,' and they just slammed the door." Pltf. Depo. at 37:10-2; see also id. at 38:10-3.

- At approximately 7:45 a.m., plaintiff began covering his cell window with wet toilet

---

[4] Plaintiff contends that the cell was in "deplorable" and "uninhabitable" condition when he was moved into it, with fresh feces smeared around the toilet and in the overhead vent. Plaintiff had difficulty breathing and was concerned that this would exacerbate his heart condition. He spent the night sitting at the end of the bed because he didn't want to touch anything. Pltf. Depo. at 33-5.

paper, with the goal of obtaining the attention of staff.[5] Plaintiff explained at his deposition, "by policy when an inmate does this, it's required for [staff] to focus on that individual in that room and what's going on behind that wall." Pltf. Depo. at 38:15-8; see also 43:18-22.

- Correctional Counselor C. Lacy was assigned that day to conduct "open line" in CSP-SAC's PSU, Building A-2. Her assignment was to walk by each cell and talk with inmates who needed assistance or had a question. Lacy Decl. ¶¶ 1, 2. Lacy passed by plaintiff's cell between 8:00 and approximately 8:20 a.m., and spoke to him. See Pltf. Depo. at 39:9-40:15 ("[M]aybe 15 to 30 minutes" after papering his window, hence at approximately 8:00 to 8:15 a.m., plaintiff "heard a woman's voice," "peeked out the window," and asked the woman (CC Lacy) if he could talk with her); Lacy Decl. ¶ 3 ("At approximately 8:20 a.m., I passed by cell A-2 107, occupied by [plaintiff], when he stopped me at his cell door." ).

- Plaintiff told Lacy that he was suicidal, and Lacy alerted the officer in the control booth to summon custody staff.

    - According to Lacy, plaintiff stated "that he was having problems and that staff were not listening to him. I do not recall what his specific complaints were about . . . . [Plaintiff ] then said that he was feeling suicidal and that he attempted suicide in the past. At that point, I turned around and called to Correctional Officer Edington, who was in the control booth. He indicated that he would send custody staff over. I then redirected my attention back to Jones, who was still standing in his cell, and waited for responding staff to arrive. Two correctional officers arrived whom I did not recognize. Once they arrived, I informed them Jones claimed he was feeling suicidal, and then continued my open line down the rest of the tier." Lacy Decl. ¶¶ 3-9.

    - Plaintiff's deposition testimony is consistent with Lacy's account: "She [Lacy] was like 'okay.' So she stood by my door and holler[ed] – notified the tower.

---

[5] In their respective declarations, neither of the defendants nor CC Lacy mention paper on plaintiff's cell window. Defendants, however, do not produce any evidence that the window was not papered.

'Look. We have a guy around says he's suicidal.' So the police came." Pltf. Depo. 39:16-9; see also id. at 40:12-5.

- After Lacy summoned assistance, plaintiff remained alone in his cell for up to 30 minutes. During that time he fashioned a noose and attempted to hang himself, then sharpened a small piece of metal and began cutting himself.

  - Plaintiff testified that once the initially-responding officers left, he slid the paper back onto his window, braided a bedsheet into a noose, and hung the noose in the overhead vent with the intent of hanging himself. Pltf. Depo. 41:10-42:14. Plaintiff testified: "So after I braided the noose, I put my neck in it, and it was – it hurt so bad it was taking so long. I took that off. So I found something sharp and I got to cutting myself, and I cut myself all up." Id. at 44:4-7. Plaintiff testified that he broke a "little metal zipper" off a "paper zipper" and "sharpened it on the ground and [] got to cutting myself with that." Id. at 44:12-6.
  - Plaintiff estimated that he started cutting himself "about 15 minutes after she [Lacy] left," "[s]omewhere about 8:30, 8:45." Id. at 45:1-5.

- Officer Kuppinger was assigned to the PSU as a Search and Escort Officer, responsible for securing inmates in mechanical restraints and escorting them to and from destinations within the prison." Kuppinger Decl. ¶¶ 3, 4. Shortly before 8:50 a.m., Officer Kuppinger was informed that plaintiff had reported to a correctional counselor that he was suicidal. Officers Kuppinger and Gomez were tasked to check on Jones and escort him to be seen by mental health staff. They proceeded to plaintiff's cell to secure him in restraints and escort him to be evaluated by mental health staff. Kuppinger Decl. ¶¶ 12-5.

- At approximately 8:50 a.m., Officers Kuppinger and Gomez arrived at plaintiff's cell. Upon opening the cell door, Officer Kuppinger observed cuts on plaintiff's left wrist, and an inmate-manufactured noose tied to the air vent. The officers secured plaintiff in handcuffs, and escorted him out of his cell toward the building rotunda, which was across the tier, down stairs, and toward the Facility A door. Kuppinger Decl. ¶¶ 15, 17.

////

- Officer Moore was working "relief coverage" at the PSU that morning, as the Building 2 floor officer. He was responsible for the A-2 block housing unit sections A, B, and C, the entrance doors, stairwells, and adjacent areas within range of vision and hearing. Shortly before 8:50 a.m., Officer Moore observed Correctional Officers Gomez and Kuppinger at plaintiff's cell door. Officer Moore joined them as plaintiff was exiting his cell. Moore Decl. ¶¶ 7, 8.

- Moore entered plaintiff's cell, retrieved a piece of scrap linen (the noose), and exited. Id. at ¶¶ 8-9.

- Officers Kuppinger and Gomez proceeded to escort plaintiff to see mental health staff. During the course of the escort, an incident occurred in which plaintiff was forced to the ground by Kuppinger and Gomez. Kuppinger Decl. ¶ 18; Pltf. Depo. 55:13-6. Two additional correctional officers arrived and assisted Kuppinger and Gomez with securing plaintiff, lifting him into a stokes litter, and then onto a rolling gurney. Kuppinger Decl. ¶¶ 19-20.[6]

- Plaintiff was evaluated by medical staff immediately after the incident. Jones Dep. 61:9-17; Kuppinger Decl. ¶ 21. The medical report indicates that plaintiff was taken to the infirmary at 9:10 a.m. with lacerations to the left forearm and swelling around both eyes. See ECF No. 1 at 39; see also Pltf. Depo. 72:18-21.[7]

B. Disputed Facts and Plaintiff's Inconsistent Statements

- Defendants Moore and Kuppinger both declare that they first came in contact with plaintiff at approximately 8:50 a.m. on May 13, 2011, after Counselor Lacy had informed staff that plaintiff felt suicidal and Kuppinger and Gomez were sent to escort him to mental health staff. See Kuppinger Decl. ¶¶ 12-5; Moore Decl. ¶¶ 6-7. Both defendants aver that they had no knowledge prior to 8:50 a.m. that plaintiff was in distress or was suicidal, and had no contact of

---

[6] This incident is the basis of plaintiff's excessive force claim, which is not before the court on summary judgment. Plaintiff alleges that Kuppinger assaulted him. Kuppinger contends that plaintiff was belligerent and resisted the escort, and that he and Gomez forced plaintiff to the ground in order to gain compliance. Kuppinger Decl. ¶ 18.

[7] Plaintiff testified that his temples were "really swollen," and in a couple of days he had two black eyes. Pltf. Depo. 62:20-2. He stated that he "had ringing on the right side of my head for four to five, maybe six, days. And they ordered a CAT brain scan. . . . I partially lost hearing on the right side of my head, and it continues to this day." Id. at 62:25-63:9; see also 68:5-7. He also stated, "they had me see an ear doctor in that same week." Id. at 67:19.

1 any kind with plaintiff prior to 8:50 a.m. Id.

- Plaintiff has made multiple inconsistent statements regarding the presence of Officers Moore and Kuppinger when medications were distributed earlier that morning. [8]

- Plaintiff has made inconsistent statements about whether either defendant was among the officers who came to his cell immediately after Counselor Lacy alerted the booth officer but

---

[8] In his FAC, plaintiff did not clearly allege that either defendant was present during the medication distribution. See FAC, ECF No. 9 at 4, ¶ 17 (generally referencing "police official[s] all the defendants").

In the operative SAC and at his deposition, plaintiff averred that the officers present at the medication distribution included defendant Moore. At his deposition, plaintiff initially testified: "It was like three police officials escorting the nurse to pass out pills. So I don't know these police. I never been on this unit before. I never seen them before." Pltf. Depo. 37:1-3. Plaintiff later testified that he "didn't know" the "maybe four officers" who initially came to his cell door except he recognized defendant Moore as one of the responding officers because Moore was the only black officer. Id. at 40:16-7; 40:24-41:1. Similarly, in the operative SAC, plaintiff alleges that the escorting officers at medication distribution included defendant Moore. See SAC, ECF No. 30 at 3, ¶ 9 ("several officers including G. Moore").

However, in his verified opposition to the pending motion, plaintiff does not reference Moore's presence at this juncture but avers that defendant Kuppinger and "unknown staff" queried plaintiff about his medication; then, in response to plaintiff's request for a cell move, "Kuppinger slammed the tray slot closed and walked away from my cell." ECF No. 105 at 2.

Moreover, in his original complaint, FAC, and verified opposition, plaintiff avers that he became suicidal *after* staff rejected his request for a cell move and then walked away. See FAC, ECF No. 9 at 4 (plaintiff became suicidal after his request for a cell move was denied, so he boarded up the windows and began ripping sheets, then approximately one hour later heard a woman's voice and told her he was suicidal); accord, original complaint, ECF No. 1 at 6 (after his request for a cell move was rejected, plaintiff "boared up all his windos and begain riping sheets. Approxitmate one hour has pasted and the plaintiff notice a woman voice, the plaintiff called her to the windown at this time the plaintiff told her he was suisidal [sic].") Similarly, in his verified opposition, plaintiff avers that he became suicidal *after* staff rejected his request to be moved and slammed his food tray, at approximately 7:30 a.m., explaining that he then "became verry distrot and came to the design of suicidal ideation which constinley honts my very existance and quickly [illegible] plaintiff (sic)." ECF No. 105 at 11. Plaintiff states that he stopped Lacy at about 8:30 a.m. and told her he was suicidal. Id. at 2.

However, in the operative SAC, plaintiff avers that "after the request [for a cell move] was denied plaintiff told the officers that he was suisidal. . . . 30 to 45 minuts later Mr. Jones herd a lady's voice Mr. Jones called the lady to his dor and told he was was suisidal[.]" SAC, ECF No. 30 at 3. Similarly, plaintiff testified that he informed CC Lacy he'd "told those officers I'm suicidal." Id. at 39:15, 40:9-10 ("I told those guys I was suicidal"); 44:2 ("I just told those guards."). However, plaintiff also testified that he told only CC Lacy that he was suicidal, at about 8:00 to 8:15 a.m. See Pltf. Depo. at 44:23-5 (Q: "Other than her did you tell anybody else you were suicidal?" A: "No."); see also id. at 43:23-5 (Q: "Did you tell anybody other than that female nurse that you were suicidal?" A: "I didn't see no one else for a little while.").

10

before plaintiff was removed from his cell.[9]

- Regarding the claim that Officer Moore failed to protect plaintiff from Officer Kuppinger's use of excessive force, Moore declares that he was not present when Kuppinger and Gomez forced plaintiff to the ground. Moore Decl. ¶ 17. Moore avers that he did not follow plaintiff and the escort officers down the stairs from the tier, but returned to the program office. Id. at ¶ 12. He returned to the housing unit as plaintiff was being lifted into the stokes litter (after the use of force). Id. at ¶ 15-16.

- Plaintiff has consistently maintained that Moore was present and witnessed the use of force. See SAC, ¶¶ 22-23, 40; Pltf. Depo. 53:21-2.[10]

////

////

---

[9] Plaintiff testified that he "didn't know" the "maybe four officers" who initially came to his cell door except he recognized defendant Moore as one of those officers because he was the only black officer. Pltf. Depo. 40:16-7; 40:24-41:1. Plaintiff testified that the officers who initially came to his cell door said, "Oh, Mr. Jones, he's just playing." Pltf. Depo. 40:17-8; 41:3. Plaintiff testified that he told CC Lacy, "Ma'am, they don't know me. I only been over here for a couple hours. I've never been in this building." Id. at 41:4-8. Plaintiff said the officers "all just walked away." Id. at 41:6. In his original complaint and FAC (but not in the operative SAC, plaintiff's deposition, or his opposition to the pending motion) plaintiff averred that the officer who made the "just playing" statement was defendant Kuppinger. See FAC, ECF No. 9 at 4; ECF No. 1 at 6.

Plaintiff has also stated that Officer Moore came to his cell and observed blood on the ground *before* Kuppinger and Gomez removed him from the cell. Plaintiff testified that defendant Moore knocked on his window at around 8:45 or 8:50 and said, "Jones, you all right? Take the curtain down." Pltf. Depo. at 45:8-11; see also id., 45:21-46:4; accord, SAC, ECF No. 30 at 3, ¶¶18-21; FAC, ECF No. 9 at 5, ¶¶ 3-5; original complaint, ECF No. 1 at 6-7, ¶¶12-4; Oppo. to pending motion, ECF No. 105 at 2:27-3:2. Plaintiff testified: "[W]hen I removed the curtain, he seen the blood, all the blood on the ground, and he pushed the alarm . . . to sound that . . . someone is in distress." Pltf. Depo. at 45:12-7; see also id. at 46:5-16. In response, "all the rest of the police arrived[.]" Id. at 46:16-7. In discovery, Moore averred that he did not activate an alarm that morning, but believes that the Control Booth Officer did so later when plaintiff was "resisting his escort" out of Moore's presence. Moore's Responses to Plaintiff's Interrogatories, Set Two, Nos. 7-8.

[10] In the operative SAC, plaintiff alleges that defendant Moore "looked on as they contenue to beat" plaintiff, and "at no time . . . tryed to stop or exercise his responsibility and present these police officials from beating him [sic] [.]" SAC, ¶¶ 22-23, ECF No. 30 at 4. Further, plaintiff alleges that defendant Moore "fail[ed] to write a report or to call or summonens Medical staff or report the abuse [sic] [.]" Id. ¶ 40, ECF No. 30 at 6. Plaintiff testified that, during the alleged assault, "Moore stood in the back watching everything." Pltf. Depo. 53:21-2.

ANALYSIS

I. Deliberate Indifference to Plaintiff's Serious Mental Health Needs

    A. Legal Standards

Prisoners have a constitutional right to adequate and timely mental health care. "The obligation to provide for the basic human needs of prisoners includes a requirement to provide access to adequate mental health care." Coleman v. Wilson, 912 F. Supp. 1282, 1298 (E. D. Cal. 1995) (citations omitted). "[T]he requirements for mental health care are the same as those for physical health care needs." Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994). "If the state fails to meet this obligation, 'it transgresses the substantive limits on state action set by the Eighth Amendment.'" Coleman, 912 F. Supp. at 1298 (quoting Helling v. McKinney, 509 U.S. 25, 32 (1993)).

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle v. Gamble, 429 U.S. 97, 104-05 (1976) (internal citations, punctuation and quotation marks omitted). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'" Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988)).

"In the Ninth Circuit, the test for deliberate indifference consists of two parts. First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendant's response to the need was deliberately indifferent. This second prong ... is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations, punctuation and quotation marks omitted); accord, Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Lemire v. CDCR,

726 F.3d 1062, 1081 (9th Cir. 2013).

To sustain a claim for deliberate indifference to serious medical needs, a prisoner must demonstrate that a prison official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).

### B. Discussion

The record supports the threshold finding, for purposes of summary judgment, that plaintiff's suicidal feelings and self-injurious conduct on May 13, 2011 constituted "serious" mental health/medical needs within the meaning of the Eighth Amendment. See Estelle, 429 U.S. at 104. Defendants do not dispute that failure to treat those needs could result in significant harm to plaintiff. This finding satisfies the first of the two prongs needed to sustain plaintiff's deliberate indifference claims. Jett, 439 F.3d at 1096.

To meet the second prong, plaintiff must demonstrate that: (a) defendants engaged in "a purposeful act or failure to respond" to his serious mental health needs, and (b) plaintiff was harmed as a result of the indifference. Id. This requires a threshold showing that defendants "knew of and disregarded" the significant risk to plaintiff's health and safety; that is, that defendants were "aware of the facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and . . . [drew] the inference." Farmer, 511 U.S. at 837.

The deliberate indifference claims against Kuppinger and Moore are necessarily based on their alleged failures to act during two time periods on the morning of May 13, 2011: (1) the period between medication distribution (at approximately 7-7:30 a.m.) and Counselor Lacy's report to the control booth officer (at approximately 8-8:20 a.m.) that plaintiff had expressed suicidal feelings; and/or (2) the period between Lacy telling the control booth officer that plaintiff expressed suicidal feelings and plaintiff's removal from his cell at 8:50 a.m. Accordingly, these claims may only proceed if plaintiff has adduced evidence that establishes a triable issue regarding defendants' knowledge of his suicidal feelings prior to his removal from his cell.

Defendants have produced sworn statements denying knowledge that plaintiff was

13

suicidal until Kuppinger and Gomez were directed to escort him to be seen by mental health staff. Although the record includes statements from plaintiff that contradict these assertions, plaintiff's own statements – about which officers were present for medication distribution, and which officers came to his cell between the time Counselor Lacy notified the control booth officer and his removal from the cell – are sufficiently inconsistent with each other and with the record as a whole that they do not create a genuine dispute of material fact. See Anderson, 477 U.S. at 252; Matsushita, 475 U.S. at 587; Radobenko, 520 F.2d at 544. For the reasons now explained, the record fails to support a reasonable finding that either Kuppinger or Moore was aware of plaintiff's serious health needs before 8:50 a.m. on the day of the incident.

First, plaintiff's statements that Moore and/or Kuppinger were present at the medication distribution are inconsistent with other statements plaintiff has made about that morning's medication distribution. See n.9, supra. No triable issue of fact is created by plaintiff's own contradictory statements, and no jury could reasonably rely on plaintiff's statements to conclude that either defendant was present. Moreover, even if one of them had been present, plaintiff has repeatedly stated that he became suicidal *after* and in response to his interactions with staff during medication distribution. Id. He has directly contradicted his own claim to have reported suicidal feelings to staff with whom he discussed his cell assignment during medication distribution. Id. Absent evidence sufficient to establish that defendants knew of plaintiff's suicidal feelings prior to his discussion with Counselor Lacy, neither defendant can be found to have disregarded such information. The state of the evidence is such that a reasonable jury could not find for plaintiff on this issue.

Second, regarding the period of time between Lacy's summoning of custodial staff and Kuppinger and Gomez's arrival to provide escort, plaintiff's own inconsistent statements fail to establish defendants' knowledge of his emergent mental health needs. Plaintiff's original and first amended complaint alleged that Kuppinger told Lacy that plaintiff was "just playing," see n.10, supra, creating the appearance of factual dispute with Kuppinger's sworn statements that he did not have knowledge of plaintiff's suicidal ideation until directed to remove plaintiff from his cell. However, plaintiff did not make this allegation against Kuppinger in the operative SAC, at

14

his deposition, or in his opposition to the pending motion. Id. Because the SAC supersedes previous pleadings, this allegation against Kuppinger has effectively been withdrawn and does not generate a genuine factual dispute.

Third, plaintiff has consistently stated that defendant Moore knocked on his cell window and observed blood prior to plaintiff's removal from his cell. Plaintiff's testimony on this point directly contradicts Moore's sworn statements that his first contact with plaintiff was from a distance when Kuppinger and Gomez arrived at plaintiff's cell. However, the court finds that this factual dispute is not material because plaintiff further alleges that defendant Moore immediately "pushed the alarm" for assistance. Accepting plaintiff's testimony as true, this fact defeats a deliberate indifference claim because it establishes that Moore acted immediately to respond to plaintiff's mental health needs. Accordingly, Moore is entitled to judgment in his favor whether or not plaintiff's version of events is credited.

For these reasons, the undersigned finds that the record fails to present a triable issue of fact on plaintiff's Eighth Amendment claims against defendants Moore and Kuppinger for deliberate indifference to plaintiff's serious mental health needs. The court therefore need not reach defendants' alternative contention that they are entitled to qualified immunity on these claims.

II. Failure to Protect Plaintiff from Excessive Force: Defendant Moore

Defendant Moore seeks summary judgment on plaintiff's claim that he failed to protect plaintiff from defendant Kuppinger's alleged use of excessive force. Defendants do not seek summary judgment on the excessive force claim against Kuppinger.

A. Legal Standards

A "failure to protect" claim under the Eighth Amendment requires a showing that "the official [knew] of and disregard[ed] an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837. Under an Eighth Amendment failure to protect claim, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, ... and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was

15

obvious." Farmer, 511 U.S. at 842 (citations omitted). The duty to protect a prisoner from serious harm requires that prison officials take reasonable measures to guarantee the safety and well-being of the prisoner. Id. at 832–33; Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir.1998). Because "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment," evidence must exist to show the defendant acted with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 297 (1991) (internal quotation marks, emphasis and citations omitted).

Whether a defendant had requisite knowledge of a substantial risk of harm is a question of fact. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. The inference of knowledge from an obvious risk has been described by the Supreme Court as a rebuttable presumption, and thus prison officials bear the burden of proving ignorance of an obvious risk. . . . [D]efendants cannot escape liability by virtue of their having turned a blind eye to facts or inferences strongly suspected to be true . . . ." Coleman, 912 F. Supp. at 1316 (citing Farmer, 511 U.S. at 842-43) (internal quotation marks omitted).

When the risk is not obvious, the requisite knowledge may still be inferred by evidence showing that the defendant refused to verify underlying facts or declined to confirm inferences that he strongly suspected to be true. Farmer, 511 U.S. at 842. On the other hand, prison officials may avoid liability by demonstrating "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Id. at 844. Thus, liability may be avoided by presenting evidence that the defendant lacked knowledge of the risk and/or that his response was reasonable in light of all the circumstances. Id. at 844-45; see also Wilson, 501 U.S. at 298; Thomas v. Ponder, 611 F.3d 1144, 1150-51 (9th Cir. 2010).

B. Discussion

The parties have presented directly conflicting witness statements on the fundamental question whether Officer Moore was present when Officer Kuppinger forced plaintiff to the

16

ground during the escort.  Defendant Moore's declaration states that he did not witness the incident at all, and plaintiff has sworn that he was present and failed to intervene.  Defendant Kuppinger's declaration does not address whether Moore was present, there is no declaration from Officer Gomez, and the remainder of the record appears to be silent on this matter.  "[S]ummary judgment cannot be used to resolve swearing contests between litigants." Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003).   Here, the parties' opposing versions of material facts precludes summary judgment on the merits of the claim.

                C.        Qualified Immunity

Defendant Moore contends, alternatively, that he is entitled to qualified immunity on plaintiff's failure to protect claim.  Government officials are immune from civil damages "unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Jeffers v. Gomez, 267 F.3d 895, 910 (9th Cir. 2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  In analyzing a qualified immunity defense, the court must consider the following:  (1) whether the alleged facts, taken in the light most favorable to the plaintiff, demonstrate that defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was clearly established at the time of the incident. Saucier v. Katz, 533 U.S. 194, 201 (2001).  These questions may be addressed in the order most appropriate to "the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

At the time of defendant Kuppinger's alleged use of excessive force against plaintiff, the right of prisoners to be free from sadistic and malicious uses of force was clearly established.  See e.g. Whitley v. Albers, 475 U.S. 312, 320-21 (1986).  A reasonable officer in Kuppinger's shoes would not have believed that it was lawful to use force on plaintiff for the purpose of inflicting harm.  It was equally well established at the time of the incident that "a prison official can violate a prisoner's Eighth Amendment rights by failing to intervene." Robins v. Meecham, 60 F.3d 1436, 1442 (9th Cir. 1995).  If defendant Kuppinger's use of force was excessive, and if defendant Moore witnessed it, then a reasonable officer in Moore's situation would not have believed that it was permissible to allow the use of force to continue without attempting to

17

intervene and protect plaintiff.

Because there are genuine disputes of material fact regarding these matters, the court is unable to find that defendant Moore is entitled to qualified immunity on plaintiff's failure to protect claim. Accordingly, defendant Moore's motion for summary judgment on plaintiff's failure to protect claim should also be denied on this basis.

CONCLUSION

For the foregoing reasons, this court recommends that:

1. Defendants' motion for partial summary judgment, ECF No. 101, be granted in part as follows:

   a. Granted to defendants Moore and Kuppinger on plaintiff's Eighth Amendment deliberate indifference claims;

   b. Denied as to plaintiff's Eighth Amendment failure to protect claim against defendant Moore.

2. This action proceed against defendant Kuppinger on plaintiff's excessive force claim, and against defendant Moore on plaintiff's failure to protect claim.

These findings and recommendations are submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court, which shall be captioned "Objections to Magistrate Judge's Findings and Recommendations." **No extensions of time will be granted, due to exigencies of time within the court.** A copy of any objections filed with the court shall also be served on all parties. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: September 6, 2017

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE